882 F.2d 87
 58 USLW 2161
 MONTGOMERY NATIONAL BANK, Appellant,
v.
Robert CLARKE, Comptroller of the Currency of the United
States, and the First Jersey National
Bank/Central, Appellees,
and
Mary Little Parell, Commissioner, New Jersey Department of
Banking, Intervenor.
 No. 89-5139.
 United States Court of Appeals,
Third Circuit.
 Submitted Pursuant to Rule 12(6) July 10, 1989.
Decided Aug. 16, 1989.
 
 Edward A. Bertele, Levy & Lybeck, P.C., Union, N.J., for appellant.
 Peter N. Perretti, Jr., Atty. Gen. of N.J., Mary C. Jacobson, Barbara S. Goldsmith, Deputy Attys. Gen., State of N.J. Div. of Law, Trenton, N.J., for Mary Little Parell, New Jersey Commissioner of Banking.
 Samuel A. Alito, Jr., U.S. Atty., Irene Dowdy, Asst. U.S. Atty., Carol M. Connelly, Trenton, N.J., for Robert Clarke, Comptroller of the Currency of the United States.
 James R. Van Horn, Asst. Gen. Counsel, Jersey City, N.J., for First Jersey Nat. Bank.
 Before HIGGINBOTHAM, BECKER, and NYGAARD, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 In 1976, plaintiff-appellant Montgomery National Bank ("MNB") opened its main office in Montgomery Township, a municipality with a population of less than 10,000. In March 1987, First Jersey National Bank/Central ("First Jersey"), a national bank, applied to the federal Office of the Comptroller of the Currency ("OCC" or "Comptroller") to open a branch office in Montgomery Township. MNB filed objections before the Comptroller, but the Comptroller nevertheless approved First Jersey's application. MNB brought suit in the district court for the District of New Jersey to challenge this administrative action. The New Jersey Department of Banking was granted leave to intervene to address the constitutionality of N.J.S.A. Sec. 17:9A-19(K) (West 1985), the statute upon which the Comptroller relied in approving First Jersey's application. The district court held the statute constitutional and granted summary judgment for the Comptroller. 703 F.Supp. 1161. MNB appealed, contending that the New Jersey statute under which the Comptroller approved First Jersey's application is so vague as to violate due process. MNB also contends that the Comptroller's decision was arbitrary and capricious. We will affirm.
 
 
 2
 * The Comptroller must approve the establishment and operation of new branches of national banks. See 12 U.S.C. Sec. 36(c) (1982). By its terms, section 36(c) authorizes the Comptroller to approve applications by national banks to establish branches "at any point within the State in which [the bank] is situated, if such establishment [is] authorized to State banks by the law of the State in question ... and subject to the restrictions as to location imposed by the law of the State on State banks." Id. Consequently, the Comptroller must apply state branching laws when acting upon an application by a national bank to open a branch within a particular state. See Springfield State Bank v. National State Bank of Elizabeth, 459 F.2d 712, 717 (3d Cir.1972).
 
 
 3
 A New Jersey statute that restricts the locations in which New Jersey state banks may branch applies, by operation of section 36(c)(2), to national banks seeking to locate branches in New Jersey. The New Jersey statute, with one relevant exception, prohibits banks from opening branch offices in municipalities of less than 10,000 if another bank has already established its home office in the municipality. See N.J.S.A. Sec. 17:9A-19(K) ("section 19(K)"). The relevant exception is that the Commissioner of the New Jersey Department of Banking ("Commissioner") "upon application ... may set aside the population requirement set forth" in the statute. Id.
 
 
 4
 The text of section 19(K) does not by itself state the criteria the Commissioner must use in deciding whether to waive section 19(K)'s bar on branch banking in municipalities of less than 10,000, but the standards that apply to the exercise of a New Jersey statute's delegation of power may be ascertained by examining the entire statute in light of its objectives. The standards need not be set forth "in express terms, if they may reasonably be inferred from the statutory scheme as a whole." Schierstead v. City of Brigantine, 20 N.J. 164, 169, 119 A.2d 5, 8 (1955). Legislative history is pertinent when construing enactments to determine the legislative plan. See, e.g., Helfrich v. Hamilton Township, 182 N.J.Super. 365, 370, 440 A.2d 1366, 1369 (App.Div.1981).
 
 
 5
 The legislative history of section 19(K) suggests that "the public interest" is the criterion the Commissioner must use in deciding whether to waive section 19(K)'s bar on branch banking in municipalities of less than 10,000. The waiver provision of section 19(K) has its origin in a 1981 statute passed by the New Jersey legislature. See 1981 N.J.Laws c. 24, Sec. 1. The Assembly Banking and Insurance Committee statement to the Senate regarding the 1981 statute stated the following:
 
 
 6
 This legislation ... provides that the Commissioner ... may permit the establishment of a ... branch office ... in any municipality, notwithstanding the statutory prohibition of such offices in municipalities with a population of 10,000 in which another banking institution maintains its principal office....
 
 
 7
 This legislation would ... permit the Commissioner to override the statutory prohibitions against [branches in towns with a population of less than 10,000]if he decides that the establishment of such banks is in the public interest.
 
 
 8
 Statement to S. 1099, Assembly Banking and Insurance Committee at 1 (1980) (emphasis added), reprinted in 1981 N.J.Sess.Law.Serv., vol. 1, p. 46 (West).
 
 
 9
 In light of its legislative history, we conclude that section 19(K) authorizes the Commissioner (and hence the Comptroller in the instant case) to permit a bank to open a branch office in a municipality whose population is under 10,000 even if another bank has its principal office there as long as the Commissioner decides that permitting the branch to open would be in the public interest.
 
 II
 
 10
 MNB contends that the New Jersey public interest standard for waiving section 19(K)'s home office protection is so vague as to violate due process. We disagree.
 
 
 11
 Vague laws may offend important values. If the state is to punish those who disobey the law, fundamental fairness requires that the prohibited activity be defined with "sufficient definiteness that ordinary people can understand what conduct is prohibited." Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). This concern is not relevant to the instant case because MNB has not been subject to any sanctions. Although a waiver of section 19(K) may reduce MNB's profits, the waiver was not a sanction for MNB's stepping over some line of conduct defined by law.
 
 
 12
 A vague law may also operate to inhibit the exercise of constitutionally protected freedoms because uncertain meanings "inevitably lead citizens to ' "steer far wider of the unlawful zone" ... than if the boundaries of the forbidden areas were clearly marked.' " Grayned v. City of Rockford, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972) (citations omitted). Indeed, the Supreme Court has stated that "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." Village of Hoffman Estates v. Flipside, 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). This concern is not relevant to the instant case as MNB clearly has no constitutionally protected right to the home office protection of section 19(K).
 
 
 13
 A vague law also creates the potential for "arbitrary and discriminatory enforcement." Grayned, 408 U.S. at 108, 92 S.Ct. at 2299. "[A] loosely worded statute allows latitude for 'discontrol, irrationality, and irregularity,' for erratic, prejudiced, discriminatory, or overreaching ... exercises of authority." A. Bickel, The Least Dangerous Branch 151 (1962) (citation omitted). Statutes have been invalidated on this basis alone. See, e.g., Holmes v. New York City Housing Authority, 398 F.2d 262, 265 (2d Cir.1968) ("[D]ue process requires that selections among applicants [for public housing] be made in accordance with 'ascertainable standards.' " (citation omitted)). See generally K. Davis, 2 Administrative Law Treatise ch. 8 (1979). This concern has at least a potential application to the instant case. Nevertheless, " 'economic regulation is subject to a less strict vagueness test' ... than regulation of protected conduct," Terson Co. v. Bakery Drivers & Salemen Local 194, 739 F.2d 118, 121 (3d Cir.1984) (citation omitted), and we will not lightly strike down an economic regulation on the ground that it is impermissibly vague. See Hotel & Restaurant Employees & Bartenders International Union Local 54 v. Read, 832 F.2d 263, 267-68 (3d Cir.1987).
 
 
 14
 In the instant case, MNB claims that the "public interest" is too indefinite a standard to satisfy due process requirements. The New Jersey Supreme Court addressed a challenge to a "public interest" provision of an earlier New Jersey banking statute and made the following observations which we believe to be pertinent here as well:
 
 
 15
 "Public interest," of course, is a broad concept. The constitutional sufficiency of terms of such sweep may not be judged in a vacuum. The context must be considered, for the context may give concreteness to what seems abstract, or may demonstrate that despite its generality a broad standard is all that may sensibly be expected if delegated authority is to be equal to the sundry situations which may arise and for which a more precise formula cannot be devised without hurtful inflexibility. There must be an appropriate concession to the complexity of government and the practical inability of the legislative branch to deal with the details of administration. In the present situation "public interest" is adequate. It acquires content from the overall objective of the statute to achieve a sound banking structure, healthily competitive, and fully adequate for the needs of the community.
 
 
 16
 Elizabeth Federal Savings & Loan Association v. Howell, 30 N.J. 190, 194, 152 A.2d 359, 361 (1959) (per curiam).
 
 
 17
 In the sphere of economic regulation, the Supreme Court has frequently upheld statutes that require administrative agencies to make determinations based upon standards such as the public interest. A "public interest, convenience, or necessity" standard for the granting or modification of radio licenses has been held "not to be too indefinite for fair enforcement." FCC v. RCA Communications, Inc., 346 U.S. 86, 90, 73 S.Ct. 998, 1002, 97 L.Ed. 1470 (1953). Similarly, statutes prohibiting "excessive profits," providing for "just and reasonable rates," proscribing "unfair methods of competition," and requiring "fair and reasonable rent" have each been upheld by the Supreme Court. See Lichter v. United States, 334 U.S. 742, 786, 68 S.Ct. 1294, 1317, 92 L.Ed. 1694 (1948) (collecting cases).
 
 
 18
 We cannot conclude that the "public interest" standard of section 19(K) is so vague as to violate due process. Banking has traditionally been a heavily regulated business subject to discretionary oversight by regulatory agencies. The interest that MNB has asserted--the right to be free of competition from another bank--is less important than other economic interests. This case, for example, is not one in which the Commissioner or the Comptroller has attempted to close MNB under a public interest rubric. Nor has MNB alleged that the New Jersey Commissioner or the Comptroller has applied the public interest standard in a discriminatory fashion. There has been no allegation, for example, that the Commission or Comptroller has treated other section 19(K) waivers differently from the one in the instant case.[1] MNB's vagueness challenge falls short of the mark.
 
 III
 
 19
 MNB also advances several statutory objections to the Comptroller's decision to permit First Jersey to open a branch near it. Each of these is meritless. The appropriate standard of review of the Comptroller's decision to approve a branch application is whether the Comptroller's adjudication was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam) (quoting 5 U.S.C. Sec. 706(2)(A) (1982)).
 
 
 20
 MNB contends that the Comptroller applied the wrong legal standard because it misinterpreted the meaning of the "public interest" within the purview of section 19(K). MNB argues, in marked contrast to its "void for vagueness" allegation, that the waiver provision of section 19(K) has a precise meaning--that the home office protection of section 19(K) can be waived only if the home bank is not "serving the needs of the communit[y] in which [it is] located." Br. at 27. MNB reasons that, section 19(K) aside, full bank branches can be opened in New Jersey only if the Commission finds that "the interests of the public will be served to advantage" thereby, N.J.S.A. Sec. 17:9A-20 ("section 20"), and that the "public interest" exception to section 19(K) must be interpreted narrowly to ensure that section 19(K) provides some independent protection to small town banks. MNB contends that its "serving the needs of the community" standard is the only one that would prevent section 19(K) from becoming meaningless statutory surplusage.
 
 
 21
 To evaluate MNB's contention that the Comptroller used the wrong legal standard, we must first discern what legal standard the Comptroller used. MNB and the Comptroller agree that the Comptroller looked to the following factors in discerning whether a First Jersey branch would be in the public interest within the meaning of section 19(K): whether First Jersey would offer products and services not already available in the community; the competitive environment; the business population of the proposed site; the general population growth; deposit growth potential; Montgomery's objections; the financial condition of First Jersey; and whether the new branch would adversely affect MNB's financial condition. See MNB Reply Br. at 5; Comptroller Br. at 13-14. In concluding that a First Jersey branch would serve the public interest, the Comptroller clearly considered factors other than whether MNB was serving the needs of the community; consequently, the Comptroller's decision was arbitrary and capricious if MNB is correct that serving the needs of the community is the only factor that may be taken into account. We believe, however, that the Comptroller properly adopted a broader approach to defining the public interest.
 
 
 22
 MNB's definition of the public interest is inadequate as it excludes from the Comptroller's consideration many factors that fall within the ordinary usage of the phrase "public interest," such as banking fees, services, and convenience to the public. That MNB serves the need of the public by operating savings accounts, for example, hardly means that the public would not benefit from having another bank nearby that also offers savings accounts. The additional bank may offer the account to the public at a higher rate of interest or on other terms that some members of the public find more favorable. Or it may provide services to the public that MNB does not offer. Alternatively, the presence of another bank in the area may induce MNB to provide better service to the public. Indeed, the Comptroller found that
 
 
 23
 MNB's existence in the community will serve to increase the competitive environment [and] provide the public with a banking alternative. This includes state of the art retail services and trust products that other banks in the area reportedly do not offer. In addition, while the population remains below the 10,000 parameter, residential building permits have grown sharply [, which] would indicate that population growth is healthy....
 
 
 24
 OCC Confidential Memorandum 2. MNB has provided us with no legislative history, case law, or other reason to believe that the New Jersey legislature expected these considerations to be excluded from a consideration of what constitutes the public interest, and it is logical to believe that they were intended to be included. By enacting the waiver provision of section 19(K), the New Jersey Assembly aligned itself with the modern trend towards more open banking by reducing the protection that local banks must receive. MNB overestimates the strength of New Jersey's policy to favor home banks.
 
 
 25
 A second reason why we conclude that the Comptroller did not err with respect to the legal standard that it used to approve First Jersey's application is that an agency's reasonable interpretation of a statute that it administers, particularly to the extent that it rests on factual premises within its expertise, is entitled to judicial deference. See Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984); Bureau of Alcohol, Tobacco & Firearms v. FLRA, 464 U.S. 89, 98 n. 8, 104 S.Ct. 439, 444-45 n. 8, 78 L.Ed.2d 195 (1983). This administrative law doctrine is usually applied to acts of Congress administered by a federal agency. Nevertheless, we believe that it also applies to a state statute that serves as a federal agency's rule of decision, if the issue raised by the unsettled question of state law falls squarely within the federal agency's field of expertise and the state courts or state agency charged with administering the state statute have not ruled out the interpretation of the statute proffered by the federal agency. Between the Courts of Appeals and the Comptroller of the Currency, the latter has greater expertise in discerning what factors come to bear in discerning whether a new bank in Montgomery Township would be in the public interest. Because the Comptroller's interpretation of section 19(K) is reasonable, we will defer to it.
 
 
 26
 Nor are we convinced by MNB's argument that the Comptroller's definition of the public interest makes section 19(K) statutory surplusage in light of section 20's requirement that no new full bank branches be opened unless the Commissioner finds that "the interests of the public will be served to advantage" thereby. N.J.S.A. Sec. 17:9A-20. The special protection of section 19(K) can best be understood as protecting home office banks from financial ruin caused by competition that is unnecessary to serve the community's banking needs or, at a minimum, as requiring that detriment to a home bank's financial condition be considered in deciding whether a new bank may open in the community. The public interest standard of section 19(K) may be distinguished from the public interest standard of section 20 applicable to the opening of new bank branches generally by according greater weight to the deleterious effect of a new branch on a home bank when making a section 19(K) public interest determination than when making a section 20 public interest determination.
 
 
 27
 The Comptroller's legal standard, as applied in the instant case, is consistent with this interpretation of section 19(K). There is no suggestion, on the instant record, that the opening of a First Jersey branch in Montgomery Township will have a substantial detrimental impact on MNB's financial condition. The Comptroller found that approval of the First Jersey branch "would not appear to have a detrimental impact" on the financial condition of MNB. OCC Confidential Memorandum 3. MMNB was permitted to submit evidence to the Comptroller that would have contradicted this finding, but it apparently failed to do so, as MNB has not cited us to anything in the administrative record inconsistent with the Comptroller's finding. Although one might presume that the opening of the First Jersey branch may cause MNB to suffer some decline in its profitability, a decline in profitability, unless it is severe, cannot be equated with a substantial detrimental impact on a bank's financial condition. In light of the Comptroller's finding, we cannot conclude, on this record, that the Comptroller's legal standard, which took account of MNB's financial condition, rendered the special protection of section 19(K) nugatory. The Comptroller's decision effectuated New Jersey policy by giving consideration to the situation of home banks in making licensing decisions.
 
 
 28
 MNB makes several other arguments. We have considered them but believe that they are without merit. There is no genuine issue of material fact in this case. We agree with the district court that, as a matter of law, the Comptroller's decision to grant First Jersey's application was not " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " Camp v. Pitts, 411 U.S. at 142, 93 S.Ct. at 1244 (quoting 5 U.S.C. Sec. 706(2)(A)). We will therefore affirm the district court's grant of summary judgment to the Comptroller.
 
 
 
 [1]
 There may be another problem with MNB's due process claim. MNB contends that the waiver provision of section 19(K) is unconstitutional. It has assumed that if we were to agree, we would strike down the waiver provision of section 19(K) but leave the rest of that section in place so as to allow MNB to enjoy home office protection. The underlying assumption behind MNB's argument, therefore, is that the waiver provision is severable from the rest of section 19(K)--that the New Jersey legislature would have preferred us to excise the waiver provision of section 19(K) rather than to strike down section 19(K) in its entirety. Although this may be, MNB has provided no argument whatsoever on this critical point. Indeed, if the waiver provision were unconstitutionally vague, then declining to waive section 19(K)'s protection pursuant to the waiver provision might deprive First Jersey of due process