217 N.J. Super. 277 (1985)
525 A.2d 1109
ATLANTIC CITY CASINO ASSOCIATION AND GREAT BAY HOTEL & CASINO, INC., T/A SANDS HOTEL & CASINO, PLAINTIFFS-RESPONDENTS,
v.
CITY OF ATLANTIC CITY, WILLIAM G. FERRY, TAX ASSESSOR OF ATLANTIC CITY, AND ALBERTA WATKINS, TAX COLLECTOR OF ATLANTIC CITY, DEFENDANTS-APPELLANTS, AND IRWIN I. KIMMELMAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, AND ATLANTIC COUNTY BOARD OF TAXATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 5, 1985.
Decided July 15, 1985.
*278 Before Judges FRITZ, GAULKIN and LONG.
Saul A. Wolfe argued the cause for appellants (Skoloff & Wolfe, attorneys).
Edward G. Rosenblum argued the cause for respondents Atlantic City Casino Association and Great Bay Hotel & Casino, *279 Inc., t/a Sands Hotel & Casino (Rosenblum & Rosenblum, P.A., attorneys).
The opinion of the court was delivered by GAULKIN, J.A.D.
Chapter 67 of the Laws of 1984 permitted Atlantic City to defer implementation of a revaluation of real property for the 1984 tax year and further granted authority to the State Treasurer to extend the "temporary moratorium" for the 1985 tax year upon the request of Atlantic City. Plaintiffs brought this action in lieu of prerogative writs to declare the legislation unconstitutional. In an oral ruling later supplemented by a written opinion, the trial judge found the statute unconstitutional as "an improper interference by the Legislature with the court," as "special legislation" and as "an unconstitutional delegation of authority to the executive branch of government." 204 N.J. Super. 652. Atlantic City and its impleaded officials appeal.[1]

I.
The factual and procedural background is undisputed. Atlantic City had not undergone a complete revaluation of its real estate since 1962. Since that time patterns of assessment had become nonuniform, in substantial disarray and at widely varying ratios assessed to true value. As of October 1, 1976, just prior to the November 2, 1976 approval of the casino gaming referendum (N.J. Const. Art. IV, § VII, par. 2D), the Director of the State Division of Taxation determined that the aggregate true value of real property in Atlantic City was slightly more than $336 million. As set forth in the certification of City Tax *280 Assessor Ferry, the passage of the casino referendum exacerbated the local assessment problems:
Subsequent to the approval of the casino referendum, there was considerable speculative activity in the real estate market in Atlantic City in terms of the potential location of sites for casino hotels and for other speculative investment. By October 1, 1978, even though no new casino hotels had been built and the only casino that was operating was Resorts in the rehabilitated Haddon Hall, the Director found that value had risen increased [sic] by more than 35% to almost $480,000,000. By October 1 of 1979, the Director found that the aggregate true value of real property in the City had almost doubled within one year to just under $932,000,000. On October 1, 1980, the Director of Taxation found that the value had again doubled within the preceding twelve months to more than $1,864,000,000. By October, 1981, the Director found that aggregate true value had increased by almost $800,000,000 to more than 2.6 billion dollars.
The increase of almost 2.3 billion dollars in the value of real property in the City of Atlantic City reflected the accelerated demand for housing as casino employees arrived in the municipality seeking adequate housing, creating a shortage and driving the market up for a brief period of time in certain areas of the City beyond fair market value. Speculative purchases in the Inlet section of the City created the impression of values which were unwarranted as later sales transactions established.
On November 15, 1978 the Atlantic County Board of Taxation ordered Atlantic City to undertake a complete revaluation of all real property within the city. The city failed to comply with that order and, by order entered on May 29, 1980 in a Law Division prerogative writs action entitled Wilczynski v. Ferry (Dkt. No. L-63650-78), the city was directed to comply with the County Board's order. On November 18, 1980, on the city's application in Wilczynski, the Law Division deferred the city's obligation to implement revaluation until the 1983 tax year.
Pursuant to the orders entered in Wilczynski, Atlantic City retained an independent revaluation concern to prepare a line-by-line item revaluation of all real property in the city. That revaluation, which purported to establish true values as of October 1, 1982, was delivered to the city tax assessor just prior to his filing the 1983 tax list with the County Board. Upon his review of the materials received, however, the assessor came to the conclusion that they "required substantial adjustments to *281 accurately reflect the value of real estate in the City of Atlantic City as of October 1, 1982."
On June 3, 1983 the Legislature enacted L. 1983, c. 202:
Notwithstanding any provisions of law or any judicial order to the contrary, no city of the fourth class having a population in excess of 40,000 shall be required to implement a revaluation of real property for the tax year 1983. The determination of a city not to implement a revaluation pursuant to this act shall not prevent the city from conducting and implementing any partial or complete reassessment of real property in the city during the time covered by the act.
A companion provision, L. 1983, c. 203, permitted any county board of taxation having jurisdiction over a municipality which determined not to implement a revaluation under Chapter 202 to revise the tax list for 1983 by deleting the new values and substituting the 1982 tax list as revised to reflect certain changes.
As a result of the moratorium effected by L. 1983, c. 202, the Atlantic City assessor had an opportunity to further analyze the revaluation work product and in November 1983 came to the conclusion "that approximately 5,000 additional changes in the revaluation list would be necessary to improve the revaluation work product." His opinion then was that implementation of the revaluation "would be even more inequitable than the updated existing tax list." By February 1984, however, he
made approximately 3,000 changes in the tax list and concluded that, while substantial further work was required in the implementation of the revaluation program and that the assessments produced by the revaluation as revised by me fell far short of achieving the revaluation objective, the implementation of the revaluation would have certain benefits for the City that might on balance slightly outweigh the inequities still existing in the revised revaluation work product.
Indeed, in January 1984 the assessor submitted the revised revaluation to the County Board as his assessment list and duplicate together with an affidavit "affirming that for the tax year 1984 he had put into operation a district wide adjustment of real property taxable valuations" which reflected market value as of October 1, 1983.
On February 3, 1984 the County Board certified and delivered to the tax collector the revised revaluation tax list. The aggregate *282 assessed value resulting from the revaluation was incorporated by the County Board into its 1984 county equalization table on February 28, 1984. On May 16, 1984 the County Board certified the general tax rate of Atlantic City at $1.733 per $100 of assessed valuation.
Before the city tax collector sent out his bills, however, L. 1984, c. 67, the subject of this litigation, was approved on July 2, 1984:
BE IT ENACTED by the Senate and General Assembly of the State of New Jersey:
1. Notwithstanding the provisions to the contrary of any law, rule, regulation or judicial order, no city of the fourth class having a population in excess of 40,000, according the latest federal decennial census, shall be required to implement a revaluation of real property for the 1984 tax year. The determination of a city not to implement a revaluation pursuant to this act shall not prevent the city from conducting and implementing any partial or complete reassessment of real property in the city during the time covered by this act.
2. At the request of a municipality that, pursuant to section 1 of this act, does not implement a revaluation of real property for the 1984 tax year, the State Treasurer shall have the authority to extend the temporary moratorium of the implementation of the revaluation for the 1985 tax year, upon the Treasurer's determination that an extension of the moratorium is in the best interest of the municipality. The municipality shall make its request for the extension to the State Treasurer on or before January 1, 1985. The Treasurer shall inform the municipality of his decision on or before January 31, 1985.
By resolution dated July 30, 1984 Atlantic City determined not to implement the revaluation for the tax year 1984 and the assessor thereupon filed with and certified to the County Board his 1983 assessment list, with some 1,200 revisions ("moratorium tax list"), in substitution for the revaluation tax list previously submitted to and certified by the County Board. The County Board in turn, on August 7, 1984, decertified the revaluation tax list for Atlantic City and certified in its place the moratorium tax list. In the same resolution the County Board readopted the Atlantic County Equalization Table and, based upon the valuations contained in the moratorium tax list, certified a new tax rate for the city of $3.906 per $100 of assessed valuation.
*283 Plaintiffs then filed this action challenging L. 1984, c. 67 on October 5, 1984.

II.
The trial judge found Chapter 67 unconstitutional as a legislative "usurpation of the function of the judiciary" because it "operates to affect the result of a judicial proceeding in which a final judgment has been entered." As New Jersey authority for that holding, the trial judge relied solely on dictum in State ex rel. Doyle v. Newark, 34 N.J.L. 236, 240 (Sup.Ct. 1870), that "[t]he judgment of a court of competent jurisdiction cannot be reversed, avoided, or set aside by the legislative power."
We find no improper legislative intrusion into the judicial sphere. It is true that private rights vested by a final judgment of a court cannot be taken away by subsequent legislation. Pennsylvania v. Wheeling & Belmont Bridge Co., 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856). But that principle does not foreclose legislative action where, as here, public rights are involved. As the United States Supreme Court held in Hodges v. Snyder, 261 U.S. 600, 43 S.Ct. 435, 67 L.Ed. 819 (1923), the cited principle
does not apply to a suit brought for the enforcement of a public right, which, even after it has been established by the judgment of the court, may be annulled by subsequent legislation, and should not be thereafter enforced; although, in so far as a private right has been incidentially established by such judgment, as for special damages to the plaintiff, or for his costs, it may not be thus taken away.
Id. at 603-04, 43 S.Ct. at 436.
Here the litigation upon which the Legislature purportedly intruded had been pending since 1978. The court had entered a number of orders to implement a revaluation and was continuing to monitor and supervise that process, which had not yet come to fruition. The last order prior to the enactment of Chapter 67 was entered November 18, 1980, deferring revaluation to the 1983 tax year. That year passed without revaluation, apparently because of the moratorium allowed by L. 1983, *284 c. 202. Thus the Wilczynski litigation had not been finally adjudicated when the Legislature enacted Chapter 67. In that setting we find neither authority nor sound public policy to foreclose the Legislature from acting to affect the public rights which were still at issue in Wilczynski. Whether the action taken by the Legislature was invalid on other grounds is not germane at this juncture; our holding is simply that neither the pendency of the Wilczynski case nor any of the orders entered therein barred the Legislature from acting with respect to the revaluation of Atlantic City real property.

III.
The trial judge also found Chapter 67 to be unconstitutional as special legislation in violation of N.J. Const. Art. IV, § VII, par. 9(6). "The statute's effective application to only one city... coupled with the application of the act to a specific year," the judge reasoned, made it "difficult to conceive of a rational basis for either (1) excluding other municipalities from the moratorium for 1984 or (2) limiting municipalities within the population classification to a moratorium for only the tax year 1984." Here again we find the judge's analysis unpersuasive.
The principles which determine whether a statute is unconstitutional as special legislation were recently iterated by the Supreme Court in the companion decisions of Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212 (1985) and Mahwah v. Bergen County Bd. of Taxation, 98 N.J. 268 (1985). A general law is "one that affects equally all of a group who, bearing in mind the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class themselves." Newark Superior Officers Ass'n, 98 N.J. at 223. Whether the classification is reasonable requires consideration of "the purpose and object of the legislation," an evaluation of "the factual situation to determine whether any one thing is excluded that should be included" and a determination whether "as so applied, the resulting classification *285 can be said to rest upon any rational reasonable basis relevant to the purpose and object of the act." Ibid. The party challenging the constitutionality of the statute has a heavy burden "to demonstrate clearly that it violates a constitutional provision"; a statute will not be declared void unless it is "clearly repugnant" to the Constitution. Id., at 222.
Tested by these standards, Chapter 67 is not void as special legislation. To be sure, Atlantic City is the only "city of the fourth class having a population in excess of 40,000, according to the latest federal decennial census"; but the fact that the statute applies to only one city does not itself require a conclusion that the legislation is special. Mahwah, 98 N.J. at 285. The question is whether Atlantic City is "distinguished by characteristics sufficiently marked and important" to justify its separate treatment with respect to a revaluation moratorium. We have already recited the history which led to the enactment of Chapter 67. We are satisfied that the peculiar and profound disturbance of real estate values resulting from the adoption of the casino referendum, which itself applied only to Atlantic City, did provide a rational or reasonable basis for the Legislature to deal separately with that municipality.[2]
Assembly Bill No. 1807, from which L. 1983, c. 202 was derived, articulated the following reasons to impose a revaluation moratorium in Atlantic City for the tax year 1983:
As a result of the "Casino Control Act," P.L. 1977, c. 110 (C.5:12-1 et seq.) and the introduction of legalized casino gaming in Atlantic City, concentrated land development is occurring in Atlantic City as hotels, tourist and entertainment facilities, and other properties are being constructed, reconstructed and expanded, while residential and other structures are being demolished to make way for new construction;
This rapid economic development is generating a dramatic escalation in property values, which is due in part to intensive speculation in the market value of *286 land and the resulting cycle of rapid turnovers of properties at increasingly higher prices; and,
Given such unusual economic circumstances, the true value of real property, based upon sales prices, is highly inflated and, if properties were revalued under such unusual economic circumstances, the revaluation would result in extremely high property tax assessments for residential property in the city which, in turn, would create unfair tax burdens for many property owners. The Legislature, therefore, declares that, consistent with its public obligation to oversee the effects of the authorization of casino gaming in Atlantic City and to assure that the economic benefits derived from that authorization accrue to all the residents of the city, it is altogether fitting and proper and within the public interest of the State and the residents of Atlantic City for the Legislature to intercede on behalf of the residents of Atlantic City to mitigate the pressures affecting their ability to maintain their residences in the city by providing a temporary prohibition against the implementation of any revaluation of real property.
Although the Legislature did not accompany Chapter 67 with findings, those recited in Assembly Bill No. 1807 provide a rational and reasonable basis for the enactment of a statute which forestalls revaluation only in Atlantic City and only for a one year (or, with the approval of the State Treasurer, a two year) period. Giving, as we must, "a wide margin of discretion" to the Legislature (Newark Superior Officers Ass'n, 98 N.J. at 222), we conclude that Chapter 67 is not "clearly repugnant" to the Constitution as special legislation. Ibid.

IV.
The trial judge further found that Chapter 67 unconstitutionally delegated authority to the executive branch by permitting an extension of the moratorium for an additional one year period upon a determination of the State Treasurer that such an extension "is in the best interest of the municipality." The trial judge found that "the enunciated `standard' is in fact no standard at all."[3]
*287 Legislative delegations to public officials to act in the "public interest" have been sustained against challenges of this nature. In Elizabeth Fed. S. & L. Ass'n v. Howell, 30 N.J. 190 (1959), the Supreme Court sustained a delegation to the Commissioner of Banking to permit branch bank relocation in the "public interest":
"Public interest," of course, is a broad concept. The constitutional sufficiency of terms of such sweep may not be judged in a vacuum. The context must be considered, for the context may give concreteness to what seems abstract, or may demonstrate that despite its generality a broad standard is all that may sensibly be expected if delegated authority is to be equal to the sundry situations which may arise and for which a more precise formula cannot be devised without hurtful inflexibility. There must be an appropriate concession to the complexity of government and the practical inability of the legislative branch to deal with the details of administration. In the present situation "public interest" is adequate. It acquires content from the overall objective of the statute.... And it is difficult to conceive of a standard which would be both more precise and equally workable.
Id. at 194; see also Mt. Laurel Tp. v. Public Advocate, 83 N.J. 522 (1980).
We are satisfied that the context of Chapter 67 does provide reasonable concreteness to the "best interest" standard imposed on the State Treasurer. As disclosed in the record before us, that context includes not only the showing of the special problems of revaluation in Atlantic City to which Chapter 67 was a response, but also the showing of the manner and means by which the amelioration of those problems over time might occur and be measured. A great many variables are thus involved in the determination whether an extension of the moratorium would be in the "best interest" of the municipality. Given the complexity of that evaluation, it is unrealistic to demand a more precise standard then that articulated by the Legislature. Recognizing "our solemn duty to resolve reasonably conflicting doubts in favor of conformity to our organic charter" (N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 8, app. dism. 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215 (1972)), we conclude that the delegation of authority to the *288 State Treasurer does not render Chapter 67 constitutionally flawed.

V.
Having rejected each of the three findings of unconstitutionality made by the trial judge, we must reverse his judgment declaring Chapter 67 unconstitutional. Our disposition of the appeal, however, should not be regarded as determining any issues beyond those we have discussed. In particular, we express no opinion whatsoever as to whether Chapter 67, or any other legislative moratorium on real property revaluation,[4] violates N.J. Const. Art. VIII, § I, par. 1(a). That issue was projected in the complaint, but the trial judge declined to decide it and the parties have not directly confronted it in their briefs before us.
The judgment declaring Chapter 67 unconstitutional is reversed.
FRITZ, P.J.A.D. (dissenting).
Although the basic purpose of this separately filed dissent is to record my respectful disagreement with the result reached by my colleagues, I announce at the outset that I disagree with nothing said in the thoughtful opinion of Judge Gaulkin. My problem with the result springs from my conviction that a perfectly reasonable deep-seated concern for the extremely pressing problem which is unique to Atlantic City and is of major consequence  which concern, incidentally, I wholly share  has caused us to come short of our obligation in the matter. Accordingly, while I cannot disagree with anything said in Section V. of the majority opinion, I think that because of the immense importance of the principle involved we should not avoid the issue on the basis of the trial judge's having *289 declined to decide it and the parties only arguing the pros and cons of that which he did decide.
As suggested by that which I have already said, I do not lightly come to disagree with my colleagues for whose judgment I hold a great deal of respect. For reasons which appear in the majority opinion the Atlantic City situation is a thing to behold. The temptation simply to join in that opinion and forget about the whole thing is almost overwhelming. But as Justice Case noted in his concurrence in Winberry v. Salisbury, 5 N.J. 240, 267 (1950), cert. den. 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950), "In my opinion, carefully reached, there is greater danger to our democratic form of government in following the lure of expediency than in marking our course by the compass." I remain sorely afraid that here we are permitting hard facts to invest bad law with a good deal of confidence.
The legal thesis underlying my difference with the result reached by the majority is simple enough. As the majority points out and for reasons explicated, patterns of assessment in Atlantic City have become nonuniform since the 1962 revaluation. Passage of the casino referendum exacerbated the situation. No one will dispute that the situation is completely out of conformity with the express, controlling mandate of Art. VIII, § I, N.J. Const. (1947). In this situation, the Legislature has chosen to put this directive of the supreme law of the land "on hold," clearly not for any partisan or political reason but simply because of the compelling exigencies involved in the Atlantic City situation. I believe that for the Legislature or this or any other court thus to attempt to suspend operation of the Constitution results not only in an unconstitutional foray contrary to fundamental tenets of established law but also in a most dangerous political situation.
I do not at all doubt the good faith of the Legislature or of my colleagues. Indeed, as I have noted, the temptation to join them in that which I believe is a noble cause is almost overwhelming. But I am satisfied that neither the Legislature nor *290 my colleagues would argue for the right of the former to suspend trial by jury (N.J. Const. (1947), Art. I, par. 9), for instance, because of a temporary paucity of jurors to serve, nor suggest that because of the present demographics respecting the mobility and nomadic quality of the population, for the present at least, a governor need not have been a New Jersey resident for the seven years next before his election (N.J. Const. (1947), Art. V, § I, par. 2). Except for degree, I see little difference between those examples and that which confronts us here.
Because suspension of the Constitution is to me such an unthinkable and dangerous precedent, I would not avoid the problem. I would affirm the declaration of unconstitutionality by the trial judge but, in complete concurrence with the majority in this respect, not for any of the reasons given by the trial judge.
NOTES
[1] The Attorney General, representing both himself and the Atlantic County Board of Taxation, has advised the court that he "will not file a brief on the merits on behalf of the State parties in this appeal."
[2] We note that in other settings our courts have upheld legislation which focuses specifically on Atlantic City as the sole site of casino gambling. See, e.g., Plaza Joint Venture v. Atlantic City, 174 N.J. Super. 231 (App.Div. 1980); Atlantic City Parking Auth. v. Atlantic Cty., 180 N.J. Super. 282 (Law Div. 1981).
[3] By letter of May 9, 1985 to Atlantic City Mayor Usry, State Treasurer Horn set forth his position that the Law Division declaration of unconstitutionality of Chapter 67 deprived him of "legal authority to extend the moratorium for the 1985 tax year"; he wrote, however, that "but for that decision, I would have granted" the requested extension.
[4] See, e.g., L. 1984, c. 41; L. 1985, c. 152.